IN RE APPLICATION OF TORONTO PIPE LINE COMPANY. TORONTO PIPE LINE COMPANY, APPELLEE, V. CAMERLAND PIPELINES COMPANY, INC., ET AL., APPELLANTS, IMPLEADED WITH OHIO PIPELINE COMPANY, INTERVENER-APPELLEE.

92 N. W. 2d 554

Filed October 17, 1958. No. 34408.

*Viren, Emmert, Hilmes & Gunderson* and *Morsman, Maxwell, Fike & Sawtell,* for appellants.

*Bert L. Overcash* and *Woods, Aitken & Aitken,* for appellee.

*Frank J. Mattoon,* for intervener-appellee.

Heard before SIMMONS, C. J., CARTER, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an appeal from an order of the Nebraska State Railway Commission granting a certificate of public convenience and necessity to Toronto Pipe Line Company to construct, operate, and maintain a pipe line gathering system in Cheyenne, Morrill, and Banner Counties.

Northwest Pipe Line Company and Camerland Pipelines Company, Inc., protested the issuance of the certificate and appeared and participated in the hearing before the commission.

Camerland Pipelines Company, Inc., is the sole appellant appearing here.

As occasion requires we will refer to the Nebraska State Railway Commission as the commission, to Toronto Pipe Line Company as Toronto, to Northwest Pipe Line Company as Northwest, and to Camerland Pipelines Company, Inc., as Camerland.

Toronto is a wholly-owned subsidiary of the British American Oil Producing Company hereinafter referred to as British American.

The record shows this situation: Some 3 miles south of the Redington Station of the Platte pipe line is an oil field served by Camerland as a common carrier under a

certificate of public convenience and necessity issued by the commission. South and east of that is the Lindberg field. Farther south and east of the Lindberg field is the Dogleg-Gaylord field. West of that is the Willson Ranch field.

British American has no production in the Lindberg field. British American produces approximately one-half of the oil coming from the Dogleg-Gaylord field. British American produces all the oil coming from the Willson Ranch field.

The oil from Lindberg, Dogleg-Gaylord, and Willson Ranch fields at the time of the hearing before the commission was being delivered to the Platte pipe line by motor truck. All parties agreed that it was not a satisfactory method of delivery and that pipe line service was required.

It appears that the initial production in the Lindberg and Dogleg-Gaylord fields did not assure economical operation of a pipe line. New wells in the Dogleg-Gaylord field gave assurance of additional oil production there.

Camerland began conversations with British American looking toward the service of those fields by Camerland pipe lines. It is clear that Camerland was unwilling at that time to construct pipe lines to serve the field unless financial commitments, not clearly defined in the record, were made by the producers.

While that was in the conversation stage, Willson Ranch field was developed so that there was reason to believe that the three fields would produce ample oils to justify the building of a pipe line. Camerland then desired to enter that field with pipe lines and was willing to do so provided it had the assurance of British American that it (Camerland) would receive British American production for carriage. British American refused to give that assurance and through its subsidiary, Toronto, proposed to build a gathering pipe line to serve those three fields. This application resulted.

It appears to be assumed that other producers in the three fields would use whatever pipe line service was provided.

It is Camerland's position that it is a common carrier already in the field and has a prior and necessarily exclusive right to extend its existing pipe line south and east to serve the three fields.

Camerland on appeal here assigns error in that Toronto has not met the requirements as to certificates of public convenience and necessity set out in the provisions of the Motor Carrier Act, which is sections 75-222 to 75-250, R. R. S. 1943. Toronto's position is that it is not subject to those provisions.

The statute with reference to pipe lines was originally enacted in 1903 in an act to provide for acquiring the right-of-way for pipe lines in the state for the transportation, transmission, and flow of petroleum and other like oils. Laws 1903, c. 67, p. 364. As amended it is now found in Chapter 75, article 6, R. R. S. 1943. In 1917 the first section of the act was amended so as to provide that those transporting "for a consideration" were "Common Carriers," and specifically providing that "Such company, corporation, or association is hereby placed under the control and subject to regulation by the State Railway Commission of the state of Nebraska, and subject to Article X of Chapter 67 of the Revised Statutes of Nebraska for the year 1913 so far as the provisions thereof are applicable to pipe lines as common carriers." Laws 1917, c. 112, § 1, p. 284. As amended this provision is now found in section 75-601, R. S. Supp., 1957. At that time Article X of Chapter 67, contained the provision that: "The commission shall have the power to regulate the rates and services of, and to exercise a general control over all railroads, express companies, car companies, sleeping car companies, freight and freight line companies, and all other common carriers engaged in the transportation of freight or passengers within the state." § 6107, Rev. St. 1913.

In 1937 the Legislature passed an act to regulate transportation of passengers and property by motor carriers in intrastate commerce upon the public highways of the state and conferred powers of administration upon the commission with reference thereto. Laws 1937, c. 142, p. 526. This act as amended is found in sections 75-222 to 75-250, R. R. S. 1943.

In the 1943 revision, legislation concerning the commission was placed in Chapter 75. This included among other acts the above Motor Carrier Act and the Pipe Line Act. The report of the 1943 Statute Commission to the Legislature recommended that the phrase in the statute referring to "Article X of chapter 67 of the revised statutes of Nebraska for the year 1913," above quoted, be changed to "subject to Chapter 75." As so changed the provision was approved and adopted as a part of the 1943 Revised Statutes.

Camerland and Northwest assumed at the hearing before the commission, and Camerland assumes here, that the above language used in the 1943 revision makes the motor carrier provisions of the statute as to certificates of public convenience and necessity applicable to pipe line common carriers.

Toronto contended at the hearing before the commission, as it does here, that it is under the control and subject to the regulation of the commission as to rates, service, and general control as provided in section 75-201, R. S. Supp., 1957, which is: "The State Railway Commission shall have the power to regulate the rates and services of, and to exercise a general control over, all railroads, express companies, car companies, sleeping car companies, freight and freight-line companies, * * * and any other carrier engaged in the transportation of freight, passengers, * * *."

It calls attention to the provisions of Article IV, section 20, of the Constitution regarding the power of the commission which provides in part: "The powers and duties of such commission shall include the regulation

of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision."

It offered evidence that the commission had not exercised the powers conferred as to pipe line common carriers in the absence of specific legislation.

Toronto's position is that recognizing the above powers of the commission over it as a common carrier by pipe line, it used the application for a certificate as a means upon which to base a request to the commission to exercise the powers which it concedes are vested in the commission.

The commission recognized that the question of the extent of its powers and jurisdiction was presented but did not decide those issues.

The Motor Carrier Act, by its title and repeatedly throughout, refers to motor carriers in intrastate commerce upon the public highways. By section 75-224, R. S. Supp., 1957, its provisions "shall apply to the transportation of passengers or property by motor carriers for hire engaged in intrastate commerce," with exceptions not important here. Section 75-228, R. R. S. 1943, relating to certificates of public convenience and necessity directly relates itself to common carriers by motor vehicle in intrastate commerce on any public highway; and so it goes throughout the entire Motor Carrier Act.

The question then comes: Did the 1943 Legislature, when it made common carriers by pipe line subject to Chapter 75 of the Revised Statutes "so far as the provisions thereof are applicable to pipe lines as common carriers," intend thereby to make the Motor Carrier Act provision as to certificates of public convenience and necessity applicable to pipe lines?

The Legislature has given this court no guide by which to determine the legislative intent. We see no

rational reason for so holding and none has been suggested to us.

Chapter 75, article 6, R. R. S. 1943, relates to the narrow and not involved field of transportation of petroleum products by pipe line common carriers for hire. It is clearly a specialized kind of transportation. It does not involve carriage by motor vehicles using the public highways. The problems of motor vehicles as common carriers using the public highways are not presented. Except insofar as a pipe line may be in or across a public highway, its existence presents no use of a highway problem. It presents no problem of regular or irregular routes or deviation of routes. Its patrons are few and known. Its problems, insofar as they relate to shippers and the public, are relatively simple in comparison with the problems presented by common carriers by motor vehicles on the public highways.

Every reason that occurs to us points against the conclusion that the Legislature intended to make the requirements of the Motor Carrier Act applicable to common carriers of petroleum by pipe line. As pointed out, the provisions of the Motor Carrier Act are made applicable to common carriers by motor vehicle in intrastate commerce on the public highways. Those provisions negative any conclusion that it is applicable to common carriers of petroleum by pipe line.

In State ex rel. Bancroft v. Frear, 144 Wis. 79, 128 N. W. 1068, 140 Am. S. R. 992, the Supreme Court had for determination a question of inclusion of an existing statute by reference. It said: "We should have as little confusion as possible in our statute law. Where the attempt is made to incorporate parts of a former law into one that is being presently made, the language used should be such as to indicate with a reasonable degree of certainty what was in the legislative mind. A careful and intelligent reading of the two acts should be sufficient to indicate to the reader what parts of the old law were applicable to and were incorporated in the new.

People are obliged to obey the laws, and in order that they may do so they should be put in a position where they can ascertain what they are." This was followed and approved in State ex rel. Kunz v. Wendt, 225 Wis. 10, 273 N. W. 72.

Obviously it cannot be found here "with a reasonable degree of certainty" that the Legislature intended to make the motor carrier provisions here discussed applicable to pipe line common carriers. To do so would be to go to the center of the field of speculation and conjecture.

Accordingly, we find no legislative intent to make the requirements of the Motor Carrier Act relating to the issuance of certificates of public convenience and necessity to common carriers by motor vehicles on the public highways "applicable" to common carriers of petroleum products by pipe line.

This conclusion makes it unnecessary to discuss the assignments of error made by Camerland here, as they are predicated on the applicability of those requirements.

For the reasons given herein the order of the commission is affirmed.

AFFIRMED.

MESSMORE, J., participating on briefs.